## APPEAL OF NORTHERN HOTEL CO.

Docket No. 2768.   Submitted July 10, 1925.   Decided March 31, 1926.

1. The March 1, 1913, value of taxpayer's estate determined on the basis of capitalizing the difference between the rent reserved in the lease and the rent which a lessee making a like lease on March 1, 1913, would have been required to pay over a period of 76 years and a deduction for an aliquot part of such value allowed for each taxable period subsequent to January 1, 1918.

2. Evidence presented in support of a claimed good will of a hotel bar examined and *held* to be inadequate to support a finding of any good will value.

3. The deduction for exhaustion, wear and tear of taxpayer's building, constructed on ground leased for a period of 99 years from completion of construction, for the period from May 1, 1892, to December 31, 1913, for each twelve-month period, *held* to be 1/97 of the construction cost.

4. Obsolescence of this hotel building began when better hotels were built, and from that time to the date of expiration of the useful life of such building obsolescence should be included in the annual deductions under the provisions of the Revenue Act of 1918 and subsequent laws. The taxpayer and the Commissioner, having agreed that the useful life of the building will end in the year 1942, the unextinguished construction cost as of January 1, 1914, should be spread uniformly over the years between 1914 and 1942, inclusive.

*Edward Thompson, C. P. A.*, for the taxpayer.
*Briggs G. Simpich, Esq.*, for the Commissioner.

Before James, Littleton, Smith, and Trussell.

This is an appeal from the determination of deficiencies in income and profits taxes for the period of four months from January 1, 1918, to April 30, 1918, in the amount of $1,344.15, and for the fiscal year beginning May 1, 1919, and ending April 30, 1920, in the amount of $4,791.42. The petition alleges specific errors as follows:

1. The disallowance as a deduction from gross income of a proportionate part of the March 1, 1913, value of a leasehold acquired by the taxpayer in the year 1890 for the period of 99 years.

2. The disallowance of a deduction from gross income of a claimed loss arising out of the destruction of the good will of the hotel bar as a result of prohibition legislation, 3/17 of such loss being claimed for the period ended April 30, 1918, and 14/17 of such loss being claimed for the period ended April 30, 1919.

3. By computing depreciation on the building, power plant, and elevators, at a composite rate of 2 per cent per annum, instead of using the following rates:

On building: 1/97 of original cost to cover ordinary wear and tear, plus 2 per cent for obsolescence beginning with 1918 when the Revenue Act permitted such a deduction.

On power plant and elevators: 5 per cent per annum.

4. Failure to credit against alleged deficiencies the amount of an overassessment for period ended April 30, 1919.

The deficiency letter appealed from was dated and issued January 13, 1925, and in view of the Act approved March 3, 1925, amending section 281 of the Revenue Act of 1924, the Commissioner admitted that the taxpayer was entitled to have credited against deficiencies asserted the overassessment for the year 1919.

### FINDINGS OF FACT.

The taxpayer is an Illinois corporation, with its principal office in the City of Chicago. It has since May 1, 1890, owned and operated the Great Northern Hotel, located on the northeast corner of Jackson Boulevard and Dearborn Street, in what is known as the Loop district of Chicago. On May 1, 1890, it acquired a 99-year lease of land having a frontage on Jackson Boulevard of 100 feet, a depth of 165 feet, and a frontage on Quincy Street of 100 feet, the area of which is 16,500 square feet, and it pays therefor an annual rental of $50,000 plus taxes through the whole term of the lease. Upon the land so acquired, and during the years 1890 to 1892, inclusive, the taxpayer constructed a 14-story hotel building then and now known as the Great Northern Hotel. This building was of so-called steel construction and was built according to the best methods of hotel

building construction then known. To May 1, 1892, the construction cost was $1,118,612.29. Since 1900 additions to the building have been made costing, during the several fiscal years ending April 30, as follows:

| | | | |
|---|---|---|---|
| 1901 | $60, 584. 56 | 1912 | $25, 243. 38 |
| 1902 | 21, 261. 87 | 1913 | 30, 909. 87 |
| 1903 | 35, 991. 07 | 1914 | 28, 133. 68 |
| 1904 | 15, 824. 25 | 1915 | 18, 359. 25 |
| 1905 | 4, 557. 30 | 1916 | 3, 164. 25 |
| 1906 | 18, 285. 61 | 1916 | [1] 3, 201. 49 |
| 1907 | 17, 122. 92 | 1917 | [2] 7, 751. 92 |
| 1908 | 18, 910. 25 | 1918 | [3] 1, 637. 43 |
| 1909 | 21, 563. 83 | 1919 | [4] 3, 827. 52 |
| 1910 | 68, 673. 57 | 1920 | [4] 3, 827. 52 |
| 1911 | 24, 086. 00 | | |

Since 1900 expenditures for construction and replacement of power plant and elevators have been made during several fiscal periods ending April 30 of each year as follows:

| | | | |
|---|---|---|---|
| 1903 | $16, 506. 00 | 1908 | $607. 90 |
| 1904 | 4, 500. 00 | 1915 | 1, 589. 93 |
| 1906 | 174, 457. 14 | 1920 | 35, 400. 00 |
| 1907 | 8, 532. 36 | | |

The elevators installed in 1903, at a cost of $16,506, were discarded in 1920.

During the years from 1893 until June 30, 1919, at which latter date war-time prohibition legislation made it unlawful, the taxpayer conducted, within the hotel building, the Great Northern Hotel bar, where intoxicating and other beverages were sold, and the conduct of this bar contributed to a considerable degree to the profits derived from the operation of the hotel.

In his adjustment of net income for the taxable periods here under consideration the Commissioner allowed deductions from gross income, on account of exhaustion, wear and tear, a uniform rate of 2 per cent upon all the building, power plant, and elevator construction.

In a letter dated December 15, 1923, the Commissioner advised the taxpayer that he had found for the fiscal year beginning May 1, 1918, and ending April 30, 1919, an overassessment of income and profits taxes in the amount of $697.06.

On March 1, 1913, the above-mentioned lease still had a remaining life of 76 years and 2 months, and the then fair market value of said leasehold was $400,000.

---

[1] Eight months ending Dec. 31.
[2] Calendar year.
[3] Four months ending Apr. 30.
[4] Twelve months ending Apr. 30.

Trussell: (1) The record of this appeal contains the testimony of three men who qualified, by reason of their long experience in the real estate business in Chicago and their dealings in and negotiations of sales and leases of properties in the Loop district, to give expert-opinion evidence as to property values, both with regard to the taxpayer's property and other properties in that vicinity. They testified that they were acquainted with the taxpayer's property, not only in the year 1913, but for years both prior to and since that date. They compared the taxpayer's property values in connection with other property values as disclosed by the record of known transactions in the same business district during and prior to the year 1913. They met together and discussed such values. They had before them the records of seven other leasing transactions in the near neighborhood where long leases had been made, either during or prior to the year 1913, at square-foot values ranging from $82.47 per square foot for a small inside tract leased in the year 1909 to a valuation of $190 a square foot for a corner tract leased in the year 1913. Between these minimum and maximum figures were other transactions at valuations of $165 per square foot and $171.88 per square foot. On State Street, near taxpayer's property, they considered two transactions, one at $211.60 per square foot and another at $234 per square foot. They also took into consideration rental values and earnings of properties similarly situated and improved, and, as a result of their investigations, inquiries, and conversations, they united in testifying that on March 1, 1913, the land embraced in the taxpayer's lease had a value of $125 per square foot, and that, in their opinion, the taxpayer's lease on that date had a fair value of $812,500. They also testified that both at the time of the making of the taxpayer's lease on May 1, 1890, and on March 1, 1913, it was the established practice of those persons owning and dealing in lands in the Loop district of Chicago to enter into and make long-term leases of such properties on a basis of a rental return of 4 per cent upon the true value of the land to be leased.

The capitalization of the rent reserved in the taxpayer's lease of $50,000 per year at 4 per cent indicates a land value in 1890 of $1,250,000. The valuation of $125 per square foot on March 1, 1913, indicates a total value of $2,062,500. The difference between these figures is $812,500. Whether this is the method which the witnesses used in arriving at the lease valuation of $812,500 is not disclosed by the record.

The value of a lessee's interest in property at any given period must be the amount which a purchaser, having the choice of acquiring the lessee's interest or entering into negotiations for acquir-

ing a lease of some other comparable property, would be willing to pay, in order to acquire the lessee's interest. It appears from the testimony that, if this particular tract of land had been in the market for the purposes of a long-term lease on March 1, 1913, at the then prevailing money values of 4 per cent, a prospective lessee would have been required to pay an annual rental equivalent to 4 per cent on $2,062,500, or $82,500 per year, which, for 76 years, would amount to $6,270,000. In the same 76 years this taxpayer must pay an annual rental of $50,000 per year, or a total of $3,800,000. The difference between these figures is $2,470,000 of total rents, which a lessee making a lease on March 1, 1913, would have had to pay in excess of the total amount to be paid under the taxpayer's lease. We are of the opinion that, under the facts and circumstances existing in the case of this taxpayer, these figures constitute a fair basis upon which may be computed the March 1, 1913, value of the taxpayer's equity in the property held by it. The difference between the payments of rent under the taxpayer's lease and under a lease which might have been made on March 1, 1913, is $32,500 per year for a period of 76 years, at the end of which time the capital value of the lease will be exhausted.

With these facts before us, we are of the opinion that the record of this appeal may be taken to establish, and we have therefore found, that the taxpayer's equity in the property held under a lease had on March 1, 1913, a fair market value of $400,000; and that, in accordance with the decisions of the Board in the *Appeals of Hotel de France Co.*, 1 B. T. A. 28; and *Grosvenor Atterbury*, 1 B. T. A. 169; and in *Henrici Co.* v. *Reinecke*, 3 Fed. (2d) 34, this taxpayer is entitled, under the Revenue Act of 1918 and in subsequent years here involved, to a deduction from gross income on account of the exhaustion of its lease equity in the amount of 1/76 of $400,000 per year.

(2) We have no hesitation in accepting the proposition that the operation of the hotel bar contributed materially to the profits of the taxpayer during the years prior to June 30, 1919. It appears, however, that no separate accounts had been kept respecting the operation of the bar, as distinct from the operation of the hotel. The testimony produced for the record of this appeal was given by an accountant who had undertaken to pick out from the general hotel books of account items appearing to have relation particularly to the operation of the bar. And while it may be that his work in this regard was done as carefully and completely as possible after a lapse of several years, it has not seemed proper for the Board to adopt his conclusions and computations as findings of fact.

It seems probable, also, that the good will of the hotel, its advertising, and its general reputation among the traveling public may have

contributed as much, if not more, toward the profitableness of the bar as the operation and good will of the bar contributed to the income and profits of the hotel business as a whole. The record further shows that when the sale of intoxicating beverages ceased the same space in the hotel building was continued to be used for lunchroom purposes, thus making the loss of the privilege of selling intoxicating beverages impossible of definite proof. In respect of this case, we are of the opinion that the good will value, if any existed, is of such an uncertain and elusive character as to make the computation of such value practically impossible where the liquor business was conducted in conjunction with other business, the conduct of which was not interfered with by prohibition legislation. The Board is therefore of the opinion that, so far as disclosed by the record of this appeal, the Commissioner did not commit any error in disallowing a deduction from gross income arising from the alleged enforced discontinuance of the sale of intoxicating beverages.

(3) The Revenue Act of 1918 provides in section 234 (a) (7) as follows:

A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.

Accepting the testimony contained in the record of this appeal to the effect that the Great Northern Hotel building was of the well-known steel-frame construction, built in accordance with the best architectural methods known in the years 1890 and 1891, deductions for exhaustion, wear and tear, and obsolescence, under the provisions of this Act, should be such a reasonable amount as the experience of business men, architects, and building engineers can estimate in advance as covering the probable average of deductions from the causes named in the statute.

We believe that it may be assumed that a fair and conservative estimate of exhaustion, wear and tear caused by weather, time, and actual use may not exceed approximately 1 per cent of the construction cost. This building, however, was erected upon leased ground, and the owner's rights under the lease had only 97 years to run after the completion of the building. We are therefore of the opinion that the deduction from gross income growing out of wear and tear and use of this building should be first computed upon the basis of 1/97 of its cost for each annual accounting period, and that, for the period of the life of this building from 1892 to the close of the year 1913, this deduction should be the amount of 1/97 of the cost of original construction plus a similar proportion of additions and improvements from the date the same were made to the end of the life of the lease.

We believe further that the obsolescence of a hotel building frequently begins at a time when better hotels are built and offered for the accommodation for the same traveling public. The record shows that during the years 1910 to 1914 four newer, better, and more modern hotels were constructed and put into operation in the business district of Chicago, thereby becoming competitors of the older hotels, which fell into a second rank in the hotel business. This drop into a rear rank in the hotel business is the kind of reduction in value caused by factors which can not be controlled or retarded.

The purpose of the deduction for losses arising from wear and tear and obsolescence is to provide free of tax a fund out of earnings and profits, the annual additions to which will at the end of the estimated period of the useful life of a property equal the cost or the March 1, 1913, value of such property. *Appeal of Grosvenor Atterbury*, 1 B. T. A. 169.

The life of the building here under consideration began on May 1, 1892. Both the Commissioner and the taxpayer have agreed that its useful life should be considered as limited by a period of 50 years from its inception, and thus ending in 1942. The Commissioner has proposed to provide the replacement fund contemplated by the statute by allowing a uniform rate of deduction for exhaustion, wear and tear of 2 per cent over the 50-year period from 1892 to 1942. The taxpayer, agreeing that 1942 will mark the limit of the useful life of its building, contends, however, that its deductions for exhaustion, wear and tear, due to the usual causes, such as action of the weather, time, and actual use, should prior to the year 1914 be computed on the basis of 1/97 of the building construction cost, while during the period from 1914 to 1942, inclusive, the deduction should be increased by an allowance for obsolescence as provided for by the Revenue Act of 1918.

During the years when this hotel building stood in the front rank of the first-class hotels of its city, there was nothing affecting its useful life other than the action of such causes as the weather, time, and actual use. When, on the other hand, it ceased to be one of the first-class hotels of its city, its economically useful life was shortened. In view of the fact that the Commissioner and the taxpayer are agreed as to the final limit of its useful life, we are of the opinion that the proper allocation of the deductions for exhaustion, wear and tear, and obsolescence should be determined and allowed as follows:

(1) For the period from May 1, 1892, to December 31, 1913, at the rate of 1/97 of the construction cost per annual period of 12 months.

(2) That the remaining unextinguished cost on January 1, 1914, should be prorated over the number of twelve-month periods between

that date and May 1, 1942; thus accounting for not only the gradual wearing out and decay of the building, but also its deterioration in value due to that form of obsolescence caused by conditions over which the taxpayer can have no control.

The record in this appeal shows capital expenditures for power plant and elevators only during the period of 1900 to 1920, inclusive, and that the elevators which were installed in the year 1903 were discarded and replaced in the year 1920. We are of the opinion that the capital cost of power plant and elevators may be fairly considered as having a life not in excess of 20 years, and that the deduction for exhaustion, wear and tear of such properties may be properly taken at the uniform rate of 5 per cent for each annual period of 12 months.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*